Erlis JEAN–BAPTISTE, Plaintiff,

v.

Jose GUTIERREZ, Defendant.

Case No. 07–21728–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Jan. 13, 2010.

**1320**

Erlis Jean–Baptiste, Lake City, FL, pro se.

*OMNIBUS ORDER ADOPTING AND AFFIRMING RECOMMENDATIONS OF MAGISTRATE JUDGE [DE 65]; [DE 66]; [DE 87]; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 37]; OVERRULING DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORTS [DE 79]; [DE 95]; GRANTING DEFENDANT'S MOTION TO STRIKE OBJECTIONS DUE TO AN INADVERTENT FILING [DE 96]*

ALAN S. GOLD, District Judge.

THIS CAUSE is before the Court upon Magistrate Judge White's Report and Recommendations [**DE 65**] and Supplemental Report and Recommendations [**DE 87**] (collectively "the Reports") recommending the denial of Defendant Officer Jose Gutierrez's Motion for Summary Judgment [**DE 37**]. Defendant filed Objections to both Reports. *See* [**DE 79**] and [**DE 95**]. Having reviewed the Reports, Defendant's

Objections thereto, and the applicable case law, I agree with the Magistrate Judge insofar as the material facts—as viewed in the light most favorable to the Plaintiff—demonstrate that Officer Gutierrez is not entitled to qualified immunity as a matter of law because he violated Plaintiff's clearly established right to be free from deadly force in a situation that requires less-than-lethal force. Accordingly, I adopt and affirm the Magistrate Judge White's Recommendations and deny Defendant's Motion for Summary Judgment.

## I. Factual Background [1]

Because the factual background of this case is recounted in great detail in the Magistrate's Reports, I present only a brief synopsis of the incident giving rise to Plaintiff's claim. During the mid-morning of July 24, 2003, Defendant Gutierrez became engaged in a vehicular pursuit and then a foot chase with suspects, who, based on a police bulletin, were believed to have been involved in an armed home invasion. [**DE 87, p. 2**]. During the course of the pursuit, Defendant Gutierrez spotted the suspects, one of whom was holding an unknown "blunt object" that Gutierrez figured was a gun. [**DE 65, p. 10**].

After a foot pursuit, Defendant Gutierrez came upon one of the suspects, the Plaintiff, in the backyard of a residence near a shed, holding what he believed to be a gun. [**DE 87, p. 2**]. Feeling that he was being ambushed by the Plaintiff, Defendant Gutierrez opened fire on the

---

1. The factual background is drawn from the facts contained in the record, viewing all evidence and taking all reasonable inferences in the light most favorable to Plaintiff as the nonmoving party. *Carr v. Tatangelo*, 338 F.3d 1259, 1266 (11th Cir.2003); *see also Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir.2005) (noting that a qualified immunity analysis must be undertaken with "the Plaintiff's best case in hand."). While some citations are made to the Reports, the undersigned has conducted an thorough and independent review of the record to verify that the factual summary contained herein is supported by record evidence. Further, because the Plaintiff is *pro se*, his pleadings and briefs are liberally construed. *Drew v. Dep't of Corrs.*, 297 F.3d 1278, 1285 (11th Cir.2002) (discussing liberal construction to which *pro se* litigants are entitled).

Plaintiff without warning, discharging his firearm multiple times until he "had completely emptied his magazine," which contained fourteen rounds of ammunition. [DE 65, p. 11]. The first or second shot struck Plaintiff in the groin area, with subsequent shots hitting him in various other body parts, including his feet and legs. [DE 65, p. 12]; [DE 87, p. 8]. Sworn statements provided by the Plaintiff and an air conditioning technician who took in the events from a nearby rooftop indicate that the first shot to the groin area immediately brought Plaintiff to the ground, and that Officer Gutierrez then "malicious[ly] and/or sadistic[ally]" fired at least ten more rounds from close range, even after Plaintiff lay incapacitated on the ground and despite the fact that Plaintiff's weapon was approximately "a foot or two away" from him. [DE 87, p. 7]; [DE 65, p. 10]; [DE 1, p. 4]; [DE 37-9, pp. 32–33]. As a result of the gunshot wounds he suffered during the course of this incident, Plaintiff was permanently injured and is now confined to a wheelchair. [DE 1, p. 5].

## II. Procedural Background

On July 6, 2007, Plaintiff filed a § 1983 claim against Defendant Gutierrez, claiming that Gutierrez used excessive force against Plaintiff in violation of his clearly established constitutional rights. [DE 1]. Upon filing, the matter was referred to Magistrate Judge White by the Court for, among other things, the issuance of a Report and Recommendation on any dispositive motions. [DE 2]. On June 20, 2008, Defendant moved for summary judgment, asserting that he was entitled to judgment as a matter of law based on the doctrine of qualified immunity. [DE 37]. On February 20, 2009, Magistrate Judge White issued a Report ("the Initial Report") recommending that Defendant's motion be denied and that the case be set for trial. See [DE 65]. On April 17, 2009, Defendant objected to the Report. [DE 79]. On September 17, 2009, after considering Defendant's objections, I entered an Order [DE 85] requesting a Supplemental Report ("the Supplemental Report") that would address certain legal and factual issues that remained unresolved by the Initial Report.[2] The Supplemental Report [DE 87] was issued on October 28, 2009, and after receiving various extensions of time, Defendant filed his Corrected Objections to the Supplemental Report [DE 95] on January 5, 2010.

## III. Standard of Review of a Magistrate Judge's Decision

Pursuant to Federal Rule of Civil Procedure 72(b), which governs dispositive motions referred to a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations" of a magistrate judge on a dispositive motion "[w]ithin 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); see also S.D. Fla. Mag. R. 4(b). If objections are timely filed, the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. Id. While the standard of review is de novo, a district judge need not re-assess every single finding and determination, for "the statute permits the district court to give to the magistrate's proposed findings of fact and

2. Specifically, I requested additional information regarding (1) Defendant's belief that Plaintiff had a gun; (2) whether pointing a gun, in contrast to mere possession, is material or necessary to warrant the use of deadly force; (3) whether a warning is required before exercising deadly force; (4) whether the number of shots fired can convert an action from permissible to unconstitutional; and (5) case law suggesting that there was clearly established law indicating Defendant's actions were unconstitutional. See [DE 85].

recommendations 'such weight as [their] merit commands and the sound discretion of the judge warrants' " without violating a party's due process rights, "so long as the ultimate decision is made by the district court." *U.S. v. Raddatz*, 447 U.S. 667, 683, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (citing *Mathews v. Weber*, 423 U.S. 261, 275, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976)). Upon review of the magistrate's decision, the district judge may accept, reject, or modify the recommended disposition, receive further evidence, recall the witnesses, or return the matter to the magistrate judge with instructions. *Id.* Further, a district judge does not abuse his discretion in either considering or refusing to consider an "argument that was not presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1290–91 (11th Cir.2009).

## IV. Analysis

After a thorough review of the record and the applicable law, Magistrate Judge White determined in his Reports that Defendant's Motion for Summary Judgment should be denied because "the parties' versions of the facts are at odds [and because] there are issues of material fact in dispute which impact on the questions of the nature of the threat that plaintiff ... posed to the defendant ... [and] the nature and extent of force that was appropriate under the circumstances." **[DE 87, p. 19]**. Defendant objects to this conclusion, asserting that a qualified immunity analysis must be undertaken "[w]ith the Plaintiff's best case in hand" and that, as a result, "material issues of disputed fact ... cannot foreclose the grant or denial of summary judgment based on qualified immuni-

ty." **[DE 95, p. 3]** (quoting *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir.2005)). Defendant also objects on the basis that Magistrate Judge White allegedly failed to shift the burden of proof to Plaintiff to demonstrate a violation of a constitutional right that was clearly established at the time of the subject incident. *Id.* at 8.[3]

While I agree with Defendant insofar as the existence of a disputed issue of material fact does not *ipso facto* defeat a summary judgment motion based on qualified immunity, *see Robinson*, 415 F.3d at 1257 (noting that "material issues of disputed fact are not a factor in the court's analysis of qualified immunity" because such issues are eliminated when district courts "take the facts in the light most favorable to the party asserting the injury"), I disagree that Defendant is entitled to the protections of qualified immunity given the facts of this particular case.

As Defendant correctly points out, the Eleventh Circuit has instructed district courts to analyze questions of qualified immunity "with the Plaintiff's best case in hand" so that "the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute." *Id.* Here, the "best case in hand" consists of Defendant Gutierrez having maliciously and sadistically[4] shot a non-resisting, non-fleeing Plaintiff an additional ten to twelve times from close range *after* having incapacitated him with an initial shot to the genital-region and *after* Plaintiff's weapon was no longer within his control. If this "best case in hand" constitutes a violation of Plaintiff's clearly established rights, then

---

**3.** Additionally, Defendant argues that the Magistrate Judge improperly gave deference to Plaintiff's criminal acquittal as support for denying Defendant's motion. *See* **[DE 95, p. 19]**. Because Plaintiff's criminal acquittal has no impact on my decision to deny Defen-

dant's summary judgment motion, I need not address this objection, as any error would be harmless.

**4.** *See* **[DE 1, p. 4]**.

Defendant's motion must be denied. *See e.g., Mercado v. City of Orlando,* 407 F.3d 1152, 1156–59 (11th Cir.2005) (reversing district court's grant of summary judgment on qualified immunity grounds because evidence was sufficient such that a reasonable jury could conclude that officer used excessive force in violation of Plaintiff's clearly established constitutional rights when he used a Sage Launcher on an armed but non-resisting Plaintiff who was lying on his kitchen floor).

■■ Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Oliver v. Fiorino,* 586 F.3d 898, 904–05 (11th Cir.2009). Thus, the critical question that must be answered in this context "is whether the officer's conduct [was] objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir.2002). Of course, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (U.S.1989). When determining whether the force used during the course of a seizure is reasonable, courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Additional considerations deemed relevant in this Circuit include "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted, and (4) whether the force was applied in good faith or maliciously and sadistically." *Sanchez v. Hialeah Police Dep't,* 357 Fed. Appx. 229, 2009 WL 4829872 (11th Cir.

Dec. 16, 2009) (citing *Hadley v. Gutierrez,* 526 F.3d 1324, 1329 (11th Cir.2008)).

■ Applying these factors the instant case leads me to conclude that even if the initial use of deadly force was constitutionally permissible, the additional ten to twelve shots fired while Plaintiff lay unarmed on the ground in an incapacitated state constituted a Fourth Amendment violation by Defendant Gutierrez. *See Bozeman v. Orum,* 422 F.3d 1265 (11th Cir. 2005) (indicating that initially justified use of force can become unconstitutional if use of force continues after threat has subsided). Accordingly, I affirm the Magistrate Judge's finding of a constitutional violation given the facts as viewed in the light most favorable to the Plaintiff.

■ Because I have determined that Plaintiff's "best case in hand" sets forth a constitutional violation based on Defendant's use of excessive force, I now address whether the Magistrate Judge correctly concluded that Defendant Gutierrez's use of excessive force violated a constitutional right that was clearly established at the time of the subject incident (i.e., July of 2003). *See Corey Airport Svcs., Inc. v. Decosta,* 587 F.3d 1280, 1285 (11th Cir.2009) (articulating two-step qualified immunity analysis). In the context of § 1983 claims, a plaintiff can demonstrate that a constitutional right was clearly established in one of three ways: "First, he can show that a materially similar case has already been decided, giving notice to the police. [Second,] [h]e could ... show that a broader, clearly established principle should control the novel facts in this situation, and [f]inally, he could show that this case fits within the exception of conduct which so obviously violates that constitution that prior case law is unnecessary." *Mercado,* 407 F.3d at 1159.

In the instant case, Magistrate Judge White concluded that the novel facts of

this case as viewed in the light most favorable to the Plaintiff implicate "broader clearly established principles" set forth in prior cases involving the use of excessive force. **[DE 87, p. 9]**. Specifically, the Reports concluded that Defendant's behavior violated the clearly established principle that "force must be proportionate to [the] need at the time it is applied, and must cease once the need for use of force no longer exists." *Id.* at 10 (citing *Skrtich v. Thornton,* 280 F.3d 1295, 1304 (11th Cir. 2002)). Defendant objects to this determination, contending that Magistrate Judge White addressed the issue too broadly given that "every case that considers the appropriate use of force in the context of the Fourth or Eighth Amendments stands for the same exact proposition." **[DE 95, p. 13]**.

▇ While Defendant is correct insofar as "the principle that officers may not use excessive force to apprehend a suspect is too broad a concept to give officers notice of unacceptable conduct," *Mercado,* 407 F.3d at 1159 (citation omitted), Defendant fails to recognize that the clearly established right implicated by Defendant Gutierrez's actions goes beyond general notions of "excessive force." Rather, the specific constitutional principle upon which Magistrate Judge White's determination rests is "that deadly force cannot be employed in a situation that requires less-than-lethal force." *Mercado,* 407 F.3d at 1159–60 (citing *Tennessee v. Garner,* 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Because binding Eleventh Circuit precedent holds that a citizen's constitutional right to be free from "deadly force in a situation that clearly would not justify its use" is clearly established, *see id.,* and because Defendant violated that right by maliciously firing ten-

plus rounds at the incapacitated and non-resisting Plaintiff who no longer posed a realistic threat or flight risk, I agree with Magistrate Judge White that the Defendant is not entitled to avail himself of the protections of qualified immunity in this particular case.

## V. Conclusion

Based on the foregoing, it is hereby ORDERED AND ADJUDGED that:

1. Magistrate Judge White's Reports and Recommendations **[DE 65]**; **[DE 66]**; **[DE 87]** are AFFIRMED AND ADOPTED in part.

2. Defendant's Motion for Summary Judgment **[DE 37]** is DENIED.

3. Defendant's Motion to Strike **[DE 96]** is GRANTED.

4. A separate order will issue setting this matter for trial before the Undersigned.

*REPORT OF MAGISTRATE JUDGE*

PATRICK A. WHITE, United States Magistrate Judge.

### I. *Introduction*

In this *pro se* civil rights action, the plaintiff Erlis Jean–Baptiste, a/k/a Erlis Baptiste–Jean, a/k/a Alex Jean Baptiste, has filed a complaint for damages pursuant to 42 U.S.C. § 1983, alleging that on July 23, 2003, the defendant, Miami–Dade Police Officer Jose Rodriguez, used excessive force against him, by shooting him during the course of his arrest. The arrest resulted in plaintiff's conviction on various charges in Miami–Dade criminal case No. F03–020927B, which stemmed from his involvement in an armed home-invasion at the residence of Malcom Duff on the morning of July 23, 2003, shortly before he was apprehended by Officer Rodriguez.[1]

---

1. The record indicates that the plaintiff is known by numerous aliases, including Alex Jean Baptiste, and Erlis Baptiste–Jean. *See*

DE# 37–4, p. 1, Sentence imposed by the Eleventh Judicial Circuit of Florida, in Case

This Cause is before the Court upon defendant Rodriguez's motion for summary judgment (DE# 37) with multiple exhibits [DE#s 37–3 to 37–23], as to which the plaintiff was advised of his right to respond (*see* Order of Instructions, DE# 38).[2] The plaintiff filed a Response

No. F03–020927B. This is noted because in various documents of record in this § 1983 action, the plaintiff is referred to by different names. For example, in a sworn statement (DE# 37–5), given at Miami–Dade Police Headquarters by Sidney Jean [who also was a suspect in the 2/24/03 home invasion], the plaintiff is referred to by the names Alex and Alex Jean, while in other documents he is referred to as Erlis and Erlis Baptiste–Jean.

2. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that summary judgment should be entered only against

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted)

Thus, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to *Celotex* and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382 (11 Cir.1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11 Cir.), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial *Fed.R.Civ.P.* 56(e); *Coleman v. Smith*, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Baldwin County, Alabama v. Purcell Corp.*, 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11 Cir.1990) (citing *Anderson v. Liberty Lobby, Inc., supra* ).

Pursuant to *Brown v. Shinbaum*, 828 F.2d 707 (11 Cir.1987), an Order (DE# 38) was entered to inform the *pro se* plaintiff of his right to respond to the defendant's motion for summary judgment, and to instruct him re-

(DE# 49, pp. 1–28, and 31) with multiple exhibits [at DE#s 49, pp. 29–30 and 32; DE# 49, pp. 33–80; and DE# 49–2, pp. 1–114]. Thereafter, defendant Rodriguez filed a Reply (DE# 63, pp. 1–15) with additional exhibits (DE# 63–2).

## II. *Law Relating to Use of Force, and Qualified Immunity*

 A claim that a law enforcement officer used excessive force in the course of an arrest, an investigatory stop, or any other seizure of a free citizen is to be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Vinyard v. Wilson*, 311 F.3d 1340, 1346–47 (11 Cir. 2002); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11 Cir.2002); *Ortega v. Schramm*, 922 F.2d 684, 694 (11 Cir.1991). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. However, "[t]he use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11 Cir.2002). To establish such a Fourth Amendment violation, Plaintiff must show (1) that a seizure occurred and (2) that the force the defendants used to carry out that seizure was unreasonable. *Harris v. Coweta County*, 433 F.3d 807, 812–13 (11 Cir.2005).

The reasonableness inquiry is made from the perspective of a reasonable officer on the scene. The question is whether the defendants' conduct was objectively reasonable, in light of all the facts and circumstances confronting them without regard to their subjective intent or motivation. Such an analysis requires a court to balance "the nature and quality of the intrusion on the individual's fourth amendment interests against the importance of the government interest alleged to justify the intrusion." *Graham, supra, quoting United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The factors a Court considers when balancing the necessity for an application of force against an arrestee's constitutional rights include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; *Graham, supra*, 490 U.S. at 396, 109 S.Ct. 1865; *Vinyard, supra*, 311 F.3d at 1347; *Lee, supra*, 284 F.3d at 1197; *Ortega, supra*, 922 F.2d at 695. In determining whether force applied was "reasonable" under the circumstances (*i.e.*, proportional to the need for its use), the Court must examine: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; and (3) the extent of the injury inflicted upon the individual to whom the force was applied. *Vinyard*, at 1347; *Lee* at 1198.

The intentional seizure of a person "readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Although it may not always be clear when minimal police interference becomes a seizure, "there can be no question that the apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Supreme Court and the Eleventh Circuit have recognized that it is constitutionally permissible for an officer to use deadly force when the officer

garding requirements under *Fed.R.Civ.P.* 56

for a proper response to such a motion.

has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Garner, supra,* 471 U.S. at 11, 105 S.Ct. 1694; *Carr v. Tatangelo,* 338 F.3d 1259, 1268 (11 Cir.2003); *Willingham v. Loughnan,* 261 F.3d 1178, 1186 (11 Cir.2001).

The Eleventh Circuit, in *Carr, supra,* 338 F.3d at 1269, (quoting *McLenagan v. Karnes,* 27 F.3d 1002 (4 Cir.1994)), has held that "a reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." [3]

■■■ Thus, use of potentially deadly force is reasonable: when an officer "(1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Robinson v. Arrugueta,* 415 F.3d 1252, 1255 (11 Cir. 2005) (quoting *Garner, supra,* 471 U.S. at 11, 105 S.Ct. 1694).

In this matter, the defendant Gutierrez argues that he is entitled to qualified immunity.

The defense of qualified immunity insulates governmental officials from personal liability for actions taken pursuant to their discretionary authority. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Flores v. Satz,* 137 F.3d 1275 (11 Cir.1998); *Foy v. Holston,* 94 F.3d 1528 (11 Cir.1996). If the force applied was reasonable under the circumstances and not excessive, the defendant police officer has not violated any clearly established constitutional right, and is entitled to summary judgment based upon qualified immunity. *Moore v. Gwinnett County,* 967 F.2d 1495, 1498 (11 Cir.1992), *quoting, Leslie v. Ingram,* 786 F.2d 1533, 1536 (11 Cir.1986).

### III. *Discussion*

In this case, there is no dispute that, at the time of the events alleged, the defendant police officer Gutierrez was acting within the scope of his discretionary au-

---

**3.** In reaching that conclusion, the Eleventh Circuit cited *McLenagan v. Karnes,* 27 F.3d 1002 (4 Cir.1994) for it's holdings that "a police officer's use of deadly force is not excessive where he has probable cause to believe a suspect poses a threat of serious physical harm to the officers or others," and that "[r]egardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the subject officer] *could* have, in light of *Garner,* believed that his conduct was lawful, then [the officer] is entitled to qualified immunity." (*Carr, supra,* 338 F.3d at 1269) (quoting *McLenagan, supra,* 27 F.3d at 1006–1007). The Eleventh Circuit in *Carr,* further noted that the *McLenagan* Court, in reaching its holdings, determined that in certain situations a warning before use of deadly force is unnecessary, e.g., when it is not feasible, because pausing to give a warning could possibly cost the officer his life. *See Carr, supra,* at 1269,

n. 19 (quoting *McLenagan, supra,* 27 F.3d at 1007–1008) ("For all [the officer] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life"... "It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others. Although it is extremely unfortunate that [the suspect] was seriously injured, § 1983 does not purport to redress injuries resulting from reasonable mistakes").

thority. Thus, the question, when drawing inferences in favor of the non-movant/plaintiff, is whether Gutierrez's actions violated clearly established law.

Defendant Gutierrez has submitted evidence (*see* Index of Exhibits, at DE# 37–2) which includes, *inter alia,* records showing Jean–Baptiste's convictions for offenses committed on July 24, 2003; testimony by plaintiff's co-defendant, Sidney Jean; testimony by Officer Jose Gutierrez who shot Jean–Baptiste; testimony by two Miami–Dade Officers (Eleshia Lewis, and Reginald Cross) who had a surprise encounter with Sidney Jean and Erlis Jean–Baptiste on the street, after the home-invasion and before Jean–Baptiste was shot. The record also contains various police reports relating to the home invasion which occurred prior to Jean–Baptiste's arrest, and relating to Jean–Baptiste's shooting upon arrest.

Plaintiff Jean–Baptiste has submitted Court records reflecting the offenses with which he was charged, reflecting those charges that were dropped, and reflecting those for which he was acquitted when tried to a jury in Dade Circuit Court. (*See* Information, DE# 49, at pp. 33 to 42; Jury Instructions, *Id.,* pp. 43–72; and the Jury Verdict in Case F03–20927B, *Id.,* at pp. 73–75). He was charged by Information on Eight Counts: Burglary with Assault or Battery While Armed [Count 1]; Kidnapping with a Weapon [Count 2]; Aggravated Battery with a Deadly Weapon [Count 3]; Robbery using a Deadly Weapon or Firearm [Count 4]; Armed Robbery/CarJacking [Count 5]; Unlawful Possession of a Firearm by a Convicted Felon [Count 6]; Unlawful Possession of a Firearm by a Violent Career Criminal [Count 7]; and Aggravated Assault on a Police Officer [Count 8]. (*See* DE# 49, pp. 33–42). Counts 1–4 relate to events that occurred inside the Duff residence. (DE# 49, pp. 34–37). Count 5 relates to the taking of

Duff's vehicle [the red Dodge Neon] (*Id.* p. 38). By the time the case reached the jury, the firearm possession charges [Counts 6 and 7, charged at DE# 49, pp. 39–40] were dropped, and the counts were re-numbered so that Count 8 of the Information [Aggravated Assault upon a Police Officer] became Count 6 for purposes of trial and the rendering of verdicts by the jury. (*See* and *compare* Information, DE# 49 at pp. 33–42, with Jury Verdict Form, DE# 49, pp. 73–75). Count 8 [Count 6 at trial] charged that Erlis Baptiste–Jean allegedly committed aggravated assault upon "Jose Gutierrez, a Law Enforcement Officer engaged in the lawful performance of his duty, by intentionally threatening by word or act to do violence to said victim, coupled by the apparent ability to do so, by POINTING A FIREARM AT OFFICER GUTIERREZ, which created a well-founded fear ·in said victim that such violence was imminent, with a deadly weapon, to wit: A FIREARM ..." (DE# 49, p. 41).

The record shows that defendant Baptiste–Jean [plaintiff Jean–Baptiste in this § 1983 action] was convicted at trial on Counts 1–5, and that on Count 6 [based on allegedly pointing his gun at Officer Gutierrez, thereby putting him in fear for his life] he was found not guilty of aggravated assault on a police officer, and was not found guilty of the possible lesser included offenses [aggravated assault, assault on a LEO, simple assault]. (DE# 49, p. 75).

A Florida DOC record pertaining to Jean–Baptiste, dated June 11, 2008 (DE# 37–3), which was submitted by the defendant, indicates that on that date, some five years after the events alleged, Jean–Baptiste, a Black male, 6′1″ tall, weighing 195 lbs, was incarcerated at Dade C.I., serving a 15 year sentence on the Aggravated Battery conviction, and Life sentences on the convictions for armed

burglary, kidnapping, armed robbery, and armed carjacking. A copy of the state Circuit Court's Conviction and Sentence [which was deferred on 5/2/06, was entered on 8/3/06, and filed on 9/12/06] appears in the record at DE# 37–4.

The testimony of Officers Lewis and Cross indicates that they were working as partners on the morning of July 24, 2003, serving eviction papers in the neighborhood near the house where plaintiff Jean–Baptiste was shot and arrested.

Lewis described two suspects, who jumped over a fence, and found themselves in front of her and Cross. The first was 5'6" to 5'7", and had short dread locks, called "de la sols;" and the second man was somewhat heavy set, and "the same size or a little bit taller" that the first. The thin man with the de la sols had something which appeared to be silver in his hand; and the heavy set one "had something in his hand, which was black, and appeared to be a gun." Lewis testified that she and Cross "drew down" their weapons and ordered the men several times to "drop the gun." They did not comply, and instead fled South, and jumped back over the fence. Lewis lost sight of the fleeing men and her partner Cross. She heard 5–6 shots. She set up a perimeter, and then went into a back yard, where she saw her partner (Cross) by a shed, and after walking further into the yard, almost to the rear of the shed, she was able to see another officer and a subject on the ground. Lewis then went back to her duties of serving eviction papers, and at an apartment complex saw officers detaining a second subject, who was leaning on the trunk of a police car, and whom she identified as the "skinny guy" she and Cross had seen earlier with something silver in his hand. (DE# 37–11, Sworn Statement by Lewis).

Officer Cross testified that when he and Lewis were serving evictions, he saw two subjects, both Black males, jump over the fence. According to Cross, the larger of the men (described by him as being 5'10" to 5'11", and 230–240 lbs) had gun in his hand. When asked if he could tell what kind of gun it was, Cross said that it was "a black gun, semiautomatic." Cross was unable to say that the other man (whom he described as being of slighter build-"thin" and perhaps 5'11") was armed. Cross testified that he "drew down" on the armed individual, and asked him several times to drop his gun. Cross testified that "he refused to drop his gun. Then, he turned and jumped back over the fence and fled southbound through the parking lot." Cross testified that a short time later he heard 5–6 gunshots, that he "ran behind the house" and saw "the subject" was "laying on the ground, face down," and Officer Gutierrez "was standing over the subject, advising over the radio." (DE# 37–12, Sworn Statement by Cross, at pp. 3–6).

Among the defendant's exhibits are a Sworn Statement(DE# 37–5) and a Deposition (DE# 37–6) given by Sidney Jean, who with plaintiff Jean–Baptiste, was involved in the 7/23/03 home invasion, and the encounter with Officers Lewis and Cross. In his sworn statement, Sidney Jean testified that both he and his accomplice (whom he called "Alex" in his statement to police—see footnote 1, *supra*) were armed. He [Sidney Jean] had a little, black .22 automatic; and Alex had a black .38 or .45 automatic that was bigger than his .22. Sidney Jean describes the home invasion, the loading of stolen items into the victim's red four door vehicle, and their escape, with him [Sidney Jean] driving. He testified that after making a right turn and crashing into a median with metal in the middle, they bailed out. They jumped a fence, and encountered officers. Sidney Jean later heard 4 or 5 shots of gunfire. (DE# 37–5).

From the record in these summary judgment proceedings it appears that the only witnesses to the actual shooting of the plaintiff Erlis Jean–Baptiste [a/k/a Alex], were the plaintiff himself, Officer Gutierrez who shot him, and an eyewitness named Ernesto Perez, an air-conditioning technician who testified at plaintiff's trial (*see* Transcript T/382–390, at DE# 49–2 pp. 64–72).[4] Perez testified that on 7/24/03 he was working on the roof of a 5 story building, and heard police sirens. When he heard a crash, he looked down, and saw that a red car had hit a wall in the middle of an intersection. The car doors were open, and two men were running. They wore black pants and shirts. Near a house, which was about 100 feet from Perez's rooftop location, the two men stopped, appeared to talk, and then one took off while the other "stayed around the house." At that property there were a shed and a tree. From his perspective, Perez could see a police officer arrive and run around the back of the house. Perez lost sight of the officer because of the tree, but he could see the man who had fled from the car. He was facing toward Perez, standing behind the shed. On direct examination, Perez testified that he the "heard the shot fired and the guy fall." Perez testified that, from his vantage point, he could not see the shooter firing his weapon. He testified that: "[he] fell to the ground. The officer came and both-another officer came right after, and then they turned around and put handcuffs on him." On cross-examination, Perez testified that because he was too far away, he couldn't see the faces of the people who got out of the car or see anything in the hand of the person who was shot, or in the hand of the other man; that upon being shot the man fell to the ground; and that when the second officer arrived in the yard the shooting had already taken place.

It appears from the record that what was known by the defendant Officer Gutierrez, at the time when he encountered plaintiff Jean–Baptiste near the shed, is as follows. As he testified to in a sworn police statement, taken on 7/25/03, the day after the 7/24 incident in question (DE# 37–9), Gutierrez had heard a police radio communication (a BOLO) concerning an armed home invasion robbery that had just occurred, involving 2 Black males, who were armed, and in a red "Plymouth Dodge Neon." Gutierrez proceeded toward the area, and observed a red Dodge Neon going westbound on 108 Street. Gutierrez pursued it, keeping the dispatcher apprised of his activity. After being delayed at an intersection, Gutierrez caught up to the Neon, and saw it was crashed into a wall. Gutierrez drew his weapon, saw no one was inside the car, and advised the dispatcher that he had "a bailout." Gutierrez searched on foot; a civilian on a balcony yelled and pointed toward the street; and Gutierrez saw two Black males wearing black shirts and pants, with gloves, one holding an unknown object. Due to the nature of the BOLO (an armed home invasion), Gutierrez "more or less figured that it [the unknown object] was a gun." The two men ran, and made a turn on the East side of a house. Gutierrez followed, running with his microphone in his left hand, and his gun in his right hand. He saw one of the men jump a fence, and run Northbound. Gutierrez advised the dispatcher. He could not see the other man. As Gutierrez was approaching the fence, there was a structure [a shed] to his

---

4. Jean–Baptiste states in his Amended Pretrial Statement (DE# 40) that "Ernesto Perez and Christopher Diaz will testify that they witnessed the incident from a limited vantage point." Statements by neither of those individuals is among exhibits listed by the defendant (*see* DE# 37–2, p. 1); and only testimony by Perez is listed and offered among plaintiff's Exhibits (*see* DE# 49 at p. 29).

left, and when he got to the corner of it, he saw the second Black male. Gutierrez testified, "When I turned my face, the north side, I saw the second black male holding a gun pointed directly at me." (DE# 37–9, p. 9).

When asked what he thought at that point, Gutierrez testified, "I was in fear for my life. I thought he was going to shoot me, so I immediately started shooting." (Id.). He testified that "I fired until the threat was gone, until I had completely emptied my magazine." (Id.). Gutierrez also testified that after he ceased firing, he saw the suspect fall to the ground. (Id.). When asked where he went after the suspect fell to the ground, Gutierrez testified, "I saw that he was in one place and the firearm was to the side of him. So I immediately went to the west side of the shed where I dropped my magazine and reloaded and secured to make sure there was nobody on that side." (Id.).

At deposition, taken nearly three years later, on April 20, 2006 (DE# 37–10) Gutierrez testified: "when I cleared the shed ... that's where I saw the defendant standing there with his gun pointed at me." (DE# 37–10, p. 28). When further questioned about whether he had seen the gun before, Gutierrez stated "Like I said at that time it was a blunt object in the hand. And due to the nature of the call, instinct already told me it was a gun due to the fact that they dispatched the home invasion robbery as two subjects with guns, driving a red Dodge Neon, which all came together." (Id. at p. 29). Gutierrez testified that the suspect had the gun pointed directly at him (Id., p. 30), and stated his opinion that "the defendant was basically trying to ambush me." (Id., pp. 30). When asked if he told the man to drop the gun (Id.), Gutierrez testified "Absolutely not. At that point in time there's a firearm pointed at me. If I would have told him to drop the gun, I would be dead

right now. We wouldn't be having this conversation." (Id., at p. 31). When asked if the man shot at him, Gutierrez testified, "I don't know if he ever got a chance ...". (Id.). When questioned about how many times he fired, Gutierrez testified that "I cleared my entire magazine, which was 14 rounds;" and that he shot them off "one right after the other." (Id.). Gutierrez testified that it was only after the very last round that "the subject finally went down." (Id., at p. 32). When asked what happened then, Gutierrez testified, "After that I approach, I see the subject, I see the firearm, it's laying next to him. My instinct was to make sure there's no threat on the other side. I went ahead and dropped my magazine and reloaded my firearm." (Id.). Then, after reloading, Gutierrez got on the air and advised, "shots fired, shots fired, rescue." (Id.). Thereafter, Officer Mzeghet arrived on the scene. (Id., at p. 33).

The plaintiff, Erlis Jean–Baptiste, in his sworn affidavit (Ex. A, scanned at DE# 49, pp. 30 and 32), states that "I at no time pointed a firearm of any sort at defendant, Jose Gutierrez, or otherwise threatened Jose Gutierrez by word or act on said July 24, 2003 ...". (Id., at p. 30). He further states that on that date he "was standing next to a shed type structure" when defendant Gutierrez "rounded the corner" and "encountered me standing by the shed." (Id.). Jean–Baptiste swears that Gutierrez, "without saying a single word to me ... opened fire on me with a high caliber firearm," and did so without any warning, by word or act, that he would shoot, and without "any instruction whatsoever, that I might have been able to respond to in order to avoid being shot by Jose Gutierrez." (Id.). Jean–Baptiste states his opinion that the shooting was "without warning, provocation, or cause." (Id.).

Regarding his injuries, the discharge of the officer's weapon, and Gutierrez's ac-

tions after encountering him, the plaintiff swears in his Affidavit, as follows. "I was struck in the groin or testicle area by Jose Gutierrez's first or second shot, which brought me to the ground, *immediately."* (*Id.*). Plaintiff also swears that "after I fell to the ground from Jose Gutierrez's first or second shot, Jose Gutierrez did not stop shooting me," and further swears that "[t]o the contrary, from approximately eight to ten feet away form [sic] where I lay on the ground, Jose Gutierrez stood over me and continued to shoot me until there were no bullets left in his gun, and even then he did not stop pulling the trigger on his gun, but continued to pull the trigger at least two additional times even though his gun was out of bullets." (*Id.,* at pp. 30, 32). Jean–Baptiste, while not explicitly stating that he was not in possession of a weapon, states in his affidavit that "I did not possess a *cocked,* firearm at any time. If a firearm was found *cocked* then it was *cocked* by someone other than me." (*Id.,* p. 32).

The Police Investigation and Crime Scene and Laboratory Reports, and related documents (DE#s 37–14 through 37–23), including a Police crime scene drawing and photographs, indicate the following. Two guns were found on the ground. One, a blue steel Beretta .25 caliber semi-automatic pistol, was found in the grass in the front yard located at 617 N.E. 137 Street. The hammer was down, the safety was off, the chamber was empty, and 7 cartridges were in the magazine. At the main scene, at the rear of the property located at 625 N.E. 137 Street, in the grass just to the east of a pile of the shooting victim's [Jean–Baptiste's] clothing that had been cut off of him by Fire–Rescue Paramedics, investigators found a KBI 9mm Semi-automatic pistol, with the hammer half cocked, the safety off, the chamber empty, and 12 cartridges in the magazine. The clothing included a ski mask, a pair of black gloves, a pair of black and white Nike sneakers with a suspect projectile in the heel, an ankle sock, boxer shorts, a black T-shirt, a white T-shirt, and Docker pants (size 38 × 34). A single gunshot hole was observed in the top of the ankle sock, with a corresponding exit hole in the heel, which police said apparently related to the projectile found in the heel of the right sneaker. There were numerous holes in the pants, 2 on the front above the left knee, 1 on the right abdomen below the waistline, 1 on the right buttock to the right of the center seam, and a tear by the waistline, above the right rear pocket. The pants had a black cloth clip-on holster inside the waistband. There were twelve spent 9 mm casings in the grass from Gutierrez's weapon; and a 9 mm magazine from Gutierrez's weapon was found on the ground, by the shed, around the corner from where his spent cartridges lay. One projectile, discovered with a metal detector, was found in the ground behind the shed South of the pants, one projectile was found lodged in Jean–Baptiste's shoe, and a what appeared to be a bullet fragment with a small piece of bone was found on the ski mask. A police Report by Detective Sara Times indicates that at the Jackson Memorial Hospital Ryder Trauma Center, she was briefed by Dr. McKinney. According to Times' report, the doctor told her that Jean–Baptiste had multiple gun shot wounds ("GSWs"), consisting of approximately 6 GSWs to the lower extremities of the right and left legs, a GSW to the foot, and what appeared to be a GSW to the testicles.

While the Undersigned is aware of the distorting effects of hindsight,[5] and that a

---

5. "[The Court is] not to view the matter ... from the comfort and safety of [its] chambers, fearful of nothing more threatening than the

occasional paper cut as [it] read[s] a cold record accounting of what turned out to be

Court must consider the reasonableness of defendants' alleged actions from their point of view, it is generally required to accept the plaintiff's version of the underlying facts. *Troupe v. Sarasota County, Fla.,* 419 F.3d 1160, 1168 (11 Cir.2005).

In reviewing a motion for summary judgment, the court is only compelled to take reasonable inferences in favor of the non-movant. *See Tinker v. Beasley,* 429 F.3d 1324, 1326 (11 Cir.2005); *Kesinger v. Herrington,* 381 F.3d 1243, 1247 (11 Cir. 2004) ("a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment"). The Court, however, is generally obliged to resolve disputed facts in the plaintiff non-movant's favor. "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1240 n. 7 (11 Cir.2003).

Although the Court may reject fantastic or utterly implausible testimony at summary judgment, *Cf. Kesinger ex rel. Kesinger v. Herrington,* 381 F.3d 1243, 1249 (11 Cir.2004) (rejecting as "not substantial evidence" an eyewitness's testimony which was directly controverted by physical evidence), here, the plaintiff Jean–Baptiste's evidence and sworn statement regarding his and the defendant Officer Gutierrez's alleged conduct [i.e. that he (Jean–Baptiste) did not point a gun at Gutierrez, that Gutierrez shot without warning, causing him to fall to the ground after one or two shots, and that Gutierrez then moved closer and continued shooting until his clip was empty], is not so outrageous or implausible that no reasonable juror could believe this portion of his evidence. Although the bur-

den of persuasion at criminal trial is different than that required in a civil matter, it is not insignificant that a jury of his peers acquitted the plaintiff (Jean–Baptiste, a/k/a Baptiste–Jean) of committing Aggravated Battery on a LEO, or lesser included offenses, against Officer Jose Gutierrez.

As discussed further below, in this Report, the defendant Gutierrez in his Motion for Summary Judgment (DE# 37, at p. 5, footnote 4) responds to plaintiff's allegation that he [Gutierrez] shot him, causing him to fall to the ground, and then approached and stood over him and fired 12 to 13 more times.

Clearly, there are in this case, genuine issues of material fact, the existence of which makes summary disposition of Jean–Baptiste's complaint against Gutierrez inappropriate. *Celotex Corp. v. Catrett, supra.* These include whether Jean–Baptiste pointed a gun at Officer Gutierrez; how many shots were fired by defendant Gutierrez [Gutierrez states that he fired 14 times, yet only 12 casings from his 9mm gun are noted in the police reports]; from what distance and at what angle the bullets were fired; how many shots were fired by Gutierrez before plaintiff Jean–Baptiste fell to the ground [plaintiff says 1–2, and defendant says 14]; which of the shots fired by Gutierrez struck Jean–Baptiste, and which caused his wounds; and what became of the fired projectiles that were not recovered at the scene.

It is here noted that, in his Summary Judgment motion, Gutierrez argues that plaintiff's allegation that he stood over him and shot him is simply not credible, and should be rejected. Gutierrez's argument and reasoning regarding this issue/claim is, as follows:

the facts. [The Court] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision

between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe County,* 394 F.3d 1328, 1333–34 (11 Cir.2004).

Plaintiff's assertion that Off Gutierrez shot Plaintiff once, and "[a]fter plaintiff fell to the ground, the defendant, Jose Gutierrez, did stand over the plaintiff ... and shot plaintiff an additional twelve (12) to thirteen (13) times," Compl. at p. 5, is not only contradicted by the facts, but also stretches the boundaries of rational thought by alleging that a police officer who stood directly over a wounded suspect, shot that suspect twelve to thirteen times and completely missed the upper torso of the suspect and altogether the suspect at least six (6) times. According to Plaintiff's version of the facts, the laws of physics would also indicate that those six (6) bullets that were shot from Off. Gutierrez's firearm and completely missed Plaintiff would be lodged in the ground next to or in fairly close proximity to where plaintiff lay, however, only two projectiles were found anywhere near where Plaintiff fell after being shot. *See* Melgarejo Report (Ex. 14), Crime Scene Report (Ex. 15); Crime Scene Drawing (Ex. 20).

(DE# 37, Motion, at p. 5, footnote 4). Notwithstanding this logic, resolving the issue of where projectiles went after they were fired, and the other matters noted above which are in dispute, would require the Court to speculate, and make credibility determinations.

Summary judgment is not a procedure for resolving a swearing contest. *Chandler v. Baird,* 926 F.2d 1057 (11 Cir.1991). In this case, resolution of the issues and facts that are in dispute, based upon the parties' opposing and conflicting evidence, would require the Court to step outside its assigned role, and invade the province of the jury. As the Supreme Court stated in its opinion in *Anderson v. Liberty Lobby, Inc., supra,* "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

This does not mean, when taking the plaintiff's version of the facts as true [i.e. that he fell to the ground after 1–2 shots] that as to that initial use of force, the defendant Gutierrez could not possibly be entitled to qualified immunity for an initial discharge of his weapon. The plaintiff has not stated in his Affidavit that he did not have a gun in his possession at the time he was shot. He has simply said that he did not point a weapon at Gutierrez, and did not have a cocked weapon. Gutierrez knew [via a BOLO] that Black males were involved in an armed home invasion, and that they fled in a red Neon. Gutierrez also knew [from personal observation] that a car matching the description of the suspect vehicle was pursued by him and crashed, that persons who presumably bailed out of the car were pointed out to him by a civilian, that they were two Black males, that one appeared to possibly be armed, that he (Gutierrez) saw one jump a fence and disappear, and that he then suddenly came upon another Black male in a back yard near the fence. If, having the aforementioned knowledge, Gutierrez perceived that the suspect he was facing was armed and posed a risk of harm, even if he did not actually see a weapon, he could be entitled to qualified immunity, at least for an initial discharge of 1–2 projectiles which plaintiff says took him to the ground. See discussion at footnote 3 and related text of this Report, regarding *Carr, supra,* 338 F.3d at 1269 (quoting *McLenagan v. Karnes,* 27 F.3d 1002 (4 Cir.1994)). It appears, however, that a determination re-

garding whether under those circumstances Gutierrez would be entitled to qualified immunity for shooting Jean–Baptiste once or twice, still cannot be made based on the evidence of record. To do so at this juncture would again require speculation on the part of the Court. This is because, assuming as it must [i.e., taking non-movant/plaintiff's version of the facts to be true] that plaintiff did not point a gun at Gutierrez, the Court cannot determine from evidence of record whether Jean–Baptiste even had a gun in his hand that Gutierrez could see. If he did not, the Court also cannot determine what it was about Jean–Baptiste's movements or demeanor, when Gutierrez encountered him by the shed, that could have caused Gutierrez to believe that he posed to him a risk of serious bodily harm or death, so as to justify use of deadly force.

Again, taking as true plaintiff's version of the facts [that Gutierrez continued shooting him after he fell to the ground], it clearly cannot be said here, at summary judgment, that the defendant officer is entitled to disposition of the complaint, in his favor, based on entitlement to qualified immunity.

## IV. CONCLUSION

It is therefore recommended that: 1) the defendant Gutierrez's Motion for Summary Judgment (DE# 37) be denied; and 2) the case remain pending on the claim that Gutierrez used excessive force, when shooting the plaintiff Jean–Baptiste during the course of his arrest on July 24, 2003.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

### REPORT THAT CASE IS READY FOR TRIAL

In this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, a separate Report has been entered this date, recommending, for reasons stated therein, that the defendant Gutierrez's Motion for Summary Judgment (DE# 37) be denied, and that the case proceed on the plaintiff Jean–Baptiste's claim that he was subjected to the use of excessive force, when, during the course of his arrest on July 24, 2003, Gutierrez shot him multiple times. In conjunction with this Report, an Order is also being entered with instructions requiring the plaintiff to file an amended pretrial statement, as he was previously directed to do, and instructing the defendant thereafter to file his pretrial statement. The case is otherwise now at issue; and the parties have not consented to trial before a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

It is therefore respectfully recommended that this case be placed on the trial calendar of the District Judge.

### SUPPLEMENTAL REPORT OF MAGISTRATE JUDGE

This Cause is before the Court upon an Order of Reference (DE# 85) by the Honorable Alan S. Gold, United States District Judge, requesting a Supplemental Report and Recommendation, after the filing of Objections by the Defendant Rodriguez (DE# 79) in opposition to a Report (DE# 65) which recommended the denial of defendant Rodriguez's motion for summary judgment (DE# 37).

Plaintiff alleges that Gutierrez, a Miami–Dade Police Officer, used excessive force by shooting him when making his arrest. Gutierrez moved for summary judgment, arguing that under the circumstances of the case he was entitled to use deadly force to effect the plaintiff's arrest, that there is no genuine issue as to any material fact, and that he is entitled to qualified immunity.

As summarized in the Order of Reference for a Supplemental Report, defendant

Rodriguez argues in his Objections that factual disputes cited in the Report DE# 37, including whether plaintiff pointed the gun at Officer Rodriguez, and whether Rodriguez warned plaintiff to drop the gun, are not material to the determination whether a constitutional violation occurred. Rodriguez also argues that once he was authorized to use deadly force, it was immaterial whether he shot plaintiff twice (until plaintiff allegedly fell to the ground), or whether he shot the plaintiff fourteen times. Defendant Rodriguez further argues that the Report (DE# 37) failed to address whether there was clearly established law putting him on notice of constitutional violation given the facts of this case.

Although plaintiff alleged he was shot on July 23, 2003 (Complaint DE# 1), the record shows the events occurred on July 24.

The defendant and plaintiff offer differing versions of the facts. In brief, defendant police officer Gutierrez states that he engaged in a vehicular pursuit, and then a foot chase with suspects, who based on a BOLO were believed to have been involved in an armed home invasion. Gutierrez claims that he suddenly came upon plaintiff Jean–Baptiste in a back yard near a shed, waiting "in ambush" for him, with a gun raised and pointed directly at him. Gutierrez claims he feared for his life, and immediately started shooting his police weapon, without prior warning to the plaintiff that he would use deadly force, because delay could have resulted in his death. Gutierrez asserts that he discharged all rounds from his weapon in rapid succession, and that only after the last shot was fired did the plaintiff fall to the ground. The plaintiff has sworn to a different set of facts, stating he never pointed a gun at officer Gutierrez, or threatened him in any way. He states that Officer Gutierrez without a warning [which plaintiff contends would have given him a chance to comply with orders and avoid being shot multiple times] shot him once or twice, seriously wounding him and thereby bringing him to the ground, and then proceeded to stand over him from a distance of 8 to 10 feet and continued shooting until his weapon was empty, wounding him several more times. [Plaintiff supports his claim that he made no threat toward Officer Gutierrez with a weapon at him or otherwise, by referencing his acquittal at trial on all charges of assault on the defendant Officer, and dismissal of weapons possession charges, stemming from the events underlying this case].

It is here noted, for purposes of correcting the record, that the prior Report (DE# 65, at p. 15) incorrectly interpreted plaintiff Jean–Baptiste's Affidavit (DE# 49, pp. 30–31) as indicating that Officer Gutierrez had *moved closer* after discharging the first two shots [which plaintiff says immediately brought him to the ground], and then continued shooting at the plaintiff from a distance of 8–10 feet away while he lay there injured. Jean–Baptiste's Affidavit states that Gutierrez rounded the corner of the shed, encountered him standing there, and opened fire which brought him to the ground immediately after one or two shots, and that Gutierrez then, from a distance of about 8 to 10 feet from where he lay, stood over him and continued to shoot. Examination of corresponding allegations in Plaintiff's Response (DE# 49 at p. 18), which echo the statements in his Affidavit, clearly indicates that Jean–Baptiste in his Response alleges that the initial 1 or 2 shots were discharged from about 8 to 10 feet away, and that after he fell to the ground, the remaining shots were also discharged as Gutierrez stood over him, also from about 8 to 10 feet away.

■ Qualified immunity, under appropriate circumstances, serves to insulate governmental officials from personal liability for actions taken pursuant to their discretionary authority, if their conduct does not violate clearly established statutory and constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11 Cir.2002). *See also Lee v. Ferraro*, 284 F.3d 1188, 1195 (11 Cir.2002); *Flores v. Satz*, 137 F.3d 1275 (11 Cir.1998); *Foy v. Holston*, 94 F.3d 1528 (11 Cir.1996).

When engaging in an analysis at the summary judgment stage, as to whether a defendant may be entitled to qualified immunity, the court must take the facts in the light most favorable to the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11 Cir.2005); *Pace v. Capobianco*, 283 F.3d 1275, 1285 (11 Cir. 2002).

■ Once the qualified immunity defense is raised by a government official and that defendant has first shown that he was acting within his discretionary authority, *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11 Cir.2003), the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Cottone, supra*, at 1358; *Foy, supra*, at 1532. In this case, it is undisputed that the defendant Gutierrez was acting under his discretionary authority as a Miami–Dade police officer. The inquiry therefore continues, with the burden on the plaintiff.

The two part test which ensues requires that, first, the court must determine whether the plaintiff's allegations, if true, establish that the defendant violated a constitutional right. If he did not, then the Court's inquiry ends, and the defendant is entitled to qualified immunity. *Saucier,*

*supra*, 533 U.S. at 201, 121 S.Ct. 2151; *Vinyard, supra*, 311 F.3d at 1346. Second, if under the plaintiff's version of the facts, a constitutional deprivation did occur, the next step is to determine whether the right was clearly established at the time of the alleged deprivation. *Vinyard, supra*. As stated by the Supreme Court, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Court must determine "whether the state of the law ... gave [the defendant] fair warning that [his action] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Vinyard, supra*, 311 F.3d at 1347.

The Court of Appeals for the Eleventh Circuit has provided that there are three ways to show that the law was "clearly established," i.e., that the defendant had "fair warning" that his action(s) would violate a constitutional right.

One way is to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of [case law]." *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11 Cir.2002) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11 Cir.2000)). In such a case, the law is clearly established only if the standards set forth by the Supreme

Court and appropriate case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.* (quoting *Priester,* 208 F.3d at 927). These cases are sometimes referred to as "obvious clarity" cases, where the subject behavior "is far beyond the hazy border between excessive and acceptable force." *Vinyard, supra,* 311 F.3d at 1350, n. 18. Examples of such cases are *Priester supra* (case in which officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); and *Slicker v. Jackson,* 215 F.3d 1225, 1233 (11 Cir.2000) (case in which officers beat Slicker "even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way").

A second way, if the conduct is not so bad that it violates a constitutional provision on its face, is to "show that a broader, clearly established principle" gleaned from the Constitution, statutes or case law "should control the novel facts in this situation." *Mercado v. City of Orlando,* 407 F.3d 1152, 1159 (11 Cir.2005) (citing *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

A third way, if no broad case law is applicable, is to point to a "materially similar case." *Lee v. Ferraro,* 284 F.3d 1188, 1198 (11 Cir.2002). "Any case law that is 'materially similar' to the facts in the case at hand must pre-date the officer's alleged improper conduct and 'truly compel the conclusion that the plaintiff had a right under federal law.'" *Mercado, supra,* 407 F.3d at 1159 (quoting *Ensley v. Soper,* 142 F.3d 1402, 1406 (11 Cir.1998)). The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Education,* 115 F.3d 821, 826–27 n. 4 (11 Cir.1997) (en banc).

In *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court held, with respect to deadly force, that it is unreasonable for an officer to "seize an unarmed, undangerous suspect by shooting him dead ...". The *Garner* Court, however, also held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner, supra,* at 11, 105 S.Ct. 1694. The Supreme Court concluded, therefore, that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner, supra,* at 11–12, 105 S.Ct. 1694.

While a jury, accepting defendant Gutierrez's version of the facts, could find that the use of deadly force, firing in rapid succession all of his bullets, was necessary to protect himself (and possibly the public or officers not on the scene), the Court is required to conduct its qualified immunity analysis at summary judgment by viewing all the evidence in the light most favorable to the plaintiff. (As noted in the prior Report, Gutierrez indicated in his July 2003 sworn police statement that he had heard a BOLO concerning home invasion robbery, by two armed Black males, in a red Plymonth Neon. He spotted a car matching the description, and followed it until it crashed. Two Black males, one holding an object which he [Gutierrez] presumed was a gun, bailed out and ran.

Gutierrez pursued them on foot until one jumped a fence and ran Northbound, but he lost sight of the other man. As Gutierrez approached the fence he saw a shed to his left, and when he got to the corner of the shed structure he saw the second Black male, standing and holding a gun pointed directly at him. Gutierrez stated that he feared for his life, and immediately started shooting his weapon until the magazine was emptied. After he ceased firing, the suspect fell to the ground. Gutierrez said in his July 2003 Police Statement that he saw that the suspect was in one place and that the firearm was to the side of him, so he went to the other side of the shed and reloaded his weapon. At deposition, three years later, in 2006, Gutierrez testified that when he "cleared the shed" he saw the suspect "standing there with his gun pointed at me." When asked if he had seen the gun before, Gutierrez said that it was "a blunt object in the hand" and that because the BOLO was about a home invasion robbery by two men with guns, driving a red Neon, instinct had told him it was a gun. Gutierrez testified that he did not ask the man to drop the gun, or give warning that he was going to use deadly force, because if he had waited to do so he [Gutierrez] would have been dead. He testified that "I cleared my entire magazine, which was 14 rounds," discharging them "one right after the other," and testified that it was only after the very last shot that "the subject finally went down." At deposition in 2006, when Gutierrez was asked what happened then, he said that after he approached he saw the subject, and saw the firearm that was lying next to him. He wanted to make sure there was no threat on the other side, and went ahead and dropped his magazine, and reloaded his gun).

The plaintiff Jean–Baptiste's version of the facts stands in stark contrast to that of officer Gutierrez. Plaintiff states in his sworn affidavit that at no time did he point a firearm at Gutierrez, or otherwise threaten him by word or action. Plaintiff states that he was standing by the shed when Gutierrez encountered him, and Gutierrez, without any warning, opened fire. Plaintiff states that because no warning was given he had no opportunity to avoid being shot. Plaintiff states that Officer Gutierrez shot once or twice, striking him in the testicles, and that this brought him immediately to the ground. Plaintiff Jean–Baptiste swears that after the first one or two shots had already brought him to the ground, Gutierrez then stood over him and continued shooting, from a distance of about 8 to 10 feet, and did not stop until there were no bullets left in his gun. A Police Investigation Report and Crime Scene and Laboratory Reports indicate that two guns were found. One was on the ground in the front yard of a neighboring house, the other was found at the main scene of plaintiff's arrest, lying in the grass just to the East of a pile of clothing that had been cut off of the plaintiff by paramedics who responded to the scene to attend to his wounds. The pants had a black cloth clip-on gun holster inside the waistband. (As noted in the prior Report, the gun found on the ground East of the clothing was half cocked, with the safety off, the chamber empty, and 12 rounds in the magazine). Plaintiff's clothes had holes corresponding to wounds described by physicians. Plaintiff, when examined at the hospital, appeared to have 8 gunshot wounds, one to the testicles, one to the foot, and 6 others in left and right legs. There were 12 shell casings in the grass from Gutierrez's weapon; but only 2 projectiles, and the fragment of another, were found at the scene.

Apart from that of Jean–Baptiste and Gutierrez, there was testimony from an eye witness to the shooting, Ernesto Perez. Perez, an air conditioning technician, watched from the roof of a 5 story building

as the events unfolded. He saw the car crash, saw men bail out and run, and saw the shooting of Jean–Baptiste (stating he "heard the shot fired and the guy fall").

In his sworn affidavit, plaintiff Jean–Baptiste states that he did not have a cocked firearm, and that if a cocked gun was found at the scene it was cocked by someone other that him.

The shooting of Jean–Baptiste took place during daylight hours, at about 11:15 a.m. Thus, it does not appear that this is a case in which lack of illumination could contribute to confusion or mistake regarding whether a gun was being pointed at an officer.

Under the facts alleged by Jean–Baptiste, it appears that a reasonable jury could find that it was feasible for Officer Gutierrez to provide him a warning before commencing use of deadly force. Similarly, it is apparent that a reasonable jury could find that the use of force applied by Officer Gutierrez was unreasonable, where plaintiff's evidence indicates that he was not in possession of a cocked weapon, and was not pointing a firearm at the defendant Officer Gutierrez when he (Gutierrez) suddenly opened fire from a distance of 8 to 10 feet, and shot the plaintiff in the testicles, immediately bringing him to the ground, and then, after the initial discharge(s) of his weapon, stood over the plaintiff who was already wounded and lying on the ground, and continued shooting him from about 8–10 feet away until he discharged another 12 rounds and his weapon was empty, wounding the plaintiff 6 or 7 more times after he was already on the ground.

As such, under the first prong of the *Saucier* analysis, the plaintiff Jean–Baptiste has alleged facts that could support a jury finding that there was a violation of his Fourth Amendment rights.

The Court thus must turn to the second step of the *Saucier* analysis which is a determination whether the law was clearly established so as to put Gutierrez on notice that his actions would constitute a deprivation of the plaintiff Jean–Baptiste's constitutional rights. The question is whether the officer "reasonably could have believed that probable cause existed to use deadly force." *See Montoute v. Carr,* 114 F.3d 181, 184 (11 Cir.1997). The inquiry for analysis of the officer's qualified immunity defense focuses on "whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation." *Id.,* at 183.

For purposes of analysis regarding the question of clearly settled law, this case does not appear to fit into the first category mentioned above, i.e., behavior so obviously lying outside the core of what the Fourth Amendment permits, that notice via prior case law is not necessary. In such cases, there is generally undisputed evidence that force was applied when an individual (inmate or suspect) was not posing a threat to officers or trying to flee, or when the individual who had been resisting or fleeing had ceased that behavior, or was restrained, and use of force against him/her still continued. As noted *supra,* examples of such behavior were found in *Priester* and *Slicker, supra.* (In *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), a case involving the shooting of a suspect while he was fleeing in a vehicle in a potentially dangerous manner, the Supreme Court noted that such cases which are "obvious" under constitutional standards are atypical).

At the time of plaintiff Jean–Baptiste's arrest, however, there existed relevant precedent, binding in this Circuit, which falls into the second category of cases, involving broader clearly established principles. *See Skrtich v. Thornton,* 280 F.3d 1295, 1304–1305, n. 9 (11 Cir.2002) (citing *Whitley v. Albers,* 475 U.S. 312, 320–21,

106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), and *Hudson v. McMillian*, 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). The factual scenario in *Skrtich* involved the use of force by guards in an institutional setting, and not the shooting of a suspect by a police officer; but the holdings by the Eleventh Circuit in *Skrtich*, which stand for broad principles that force must be proportionate to need at the time it is applied, and must cease once the need for use of force no longer exists, are applicable to this case. The Eleventh Circuit in *Skrtich* cited *Whitley* for its holding that force being used against a prisoner must cease once the prisoner complies with an order and ceases resistance, or is incapacitated (i.e., that the use of force must stop when the need for it to maintain or restore discipline no longer exists). *Skrtich, supra*, 280 F.3d at 1304. The Court in *Skrtich* held that this principle from *Whitley* applies "whether the prisoner is in a cell, a prison yard, police car, in handcuffs on the side of the road, or in any other custodial setting." *Skrtich*, at 1304. Continuing, the *Skrtich* Court stated "[i]ndeed, our excessive force analysis has never turned on the physical location of the victim of a government official's application of excessive force," *Skrtich, supra* at 1304, n. 9., and stated that "[t]he focus has always been on the material factors, i.e., 'the need for the application of force, the relation-ship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.' " *Skrtich, supra*, 280 F.3d at 1304–05, n. 9 (quoting *Hudson, supra*, 503 U.S. at 7–8, 112 S.Ct. 995).

In addition to the holdings of *Garner*, and the general principles established by *Skrtich*, *Whitley*, and *Hudson*, computer assisted research reveals several police shooting cases from the Eleventh Circuit, falling into the third category, i.e. cases materially similar to the case at bar. The first of those cases, *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11 Cir.1987) was decided 16 years before Jean–Baptiste's July 24, 2003 shooting, which is the subject of this lawsuit. A second case, *Samples v. City of Atlanta*, 846 F.2d 1328 (11 Cir. 1988) came some 15 years before Jean–Baptiste's 2003 arrest. A third case, *Carr v. Tatangelo*, 338 F.3d 1259 (11 Cir.2003), was decided on July 23, 2003, one day before Jean–Baptiste's July 24 shooting, and was released as an amended opinion 68 days later on September 29, 2003. A Fourth case, *Caruthers v. McCawley*, 339 Fed.Appx. 987, 988–89 (11 Cir.2009), is instructive, but not binding for purposes of the qualified immunity analysis in this case, because it post-dates Jean–Baptiste's arrest by 6 years.[1]

---

1. In the case of *Caruthers v. McCawley*, decided in 2009, the Eleventh Circuit affirmed the District Court's ruling that the defendant Sheriff's Deputy McCawley was not, as a matter of law, entitled to qualified immunity because, viewing the facts in the light most favorable to Caruthers, against whom deadly force had been used in apprehending him, a reasonable jury could find that McCawley violated Caruthers' clearly established constitutional right to be free from excessive force. The events in the case unfolded after Caruthers, who was wanted for several bank robberies, including one earlier on the day of his arrest during which he had threatened to kill a teller. Caruthers was found with a woman named Gibbons in a motel by local law enforcement officers, and an Emergency Response Team ("ERT") responded. The ERT officers, including McCawley, took position outside the room after negotiations had begun. Police believed that Gibbons was a hostage, because they could see through a window that Caruthers was blocking her from leaving, and they could hear the two arguing. After two hours of negotiations between Caruthers and police, the ERT officers learned that Gibbons was going to leave the room. When the door opened, however, Caruthers came out. It is after that point that the parties' versions of the facts were in dispute. Caruthers claimed that he shouted he was

In *Lundgren,* the events occurred at a video store. On July 10, 1983, the front store window was broken. The proprietor and his wife decided to sleep inside that night. Two officers on patrol noticed the broken window. Suspecting that a burglary was in progress, they entered the store at about 2:00 a.m., unannounced. Officer Davis testified that he saw a large shadow or silhouette rise from behind a desk and saw a flash of light from a gun, and felt a blast of hot air on his forehead. Davis testified that after being shot at he returned fire, discharging his weapon three times. When the shooting stopped, Officer Davis testified that he saw a man [the shop owner, Richard Lundgren] lying on the floor, with blood trickling from his head, and saw a gun lying on the floor. The defendant Officer testified that the woman [Margaret Lundgren, the proprietor's wife] then reached for the gun, and he told her not to touch it. Although Davis testified at trial that Mrs. Lundgren had fired the first shot, he had told an investigator in a prior statement that Mr. Lundgren had fired the first shot. Officer Cloud, Davis' partner, testified at trial that he saw a man stand up from behind a desk with a pistol in both hands. Fearing that he would be shot, he closed his eyes and wheeled backwards, and while he was doing so he heard the first shot being fired. It sounded to Cloud like it came from behind the desk, but [because his eyes were closed] he did not know whether Mr. or Mrs. Lundgren had fired it. In a prior statement, however, Cloud said that Mr. Lundgren had fired the first shot with a gun that was found inside the video store. At trial, Mrs. Lundgren testified that she woke up her husband when she heard someone walking on the broken glass outside the store, and that as her husband was raising up someone started shooting and he [Mr. Lundgren] was shot. She testified that her husband was not all the way above the desk when he was shot and struck, and that her husband never fired a shot. She also denied having reached for a gun. On cross examination, Mrs. Lundgren testified that she never saw her husband reach for a gun. When confronted with her prior deposition statement in which she said "I recall him reaching for his gun," she retracted her statement, and said that she did not know whether her husband reached for a gun, and that he could have fired a shot. She also testified, that he never really had a chance to get up

surrendering and coming out, and exited the room with his hands in a "surrender position," holding a white towel in accordance with earlier police instructions. Caruthers stated that when he saw no officers directly in front of him he turned to his right and saw the ERT team kneeling behind a shield, and then heard officers yelling to raise his hands higher and get on the ground. He claimed that when attempting to raise his hands higher he was shot in the chest by McCawley, and that he then turned the other way and ran, at which time McCawley shot him three more times, striking him in the spine. While he was fleeing, another officer also shot him using a shotgun load of non-lethal "bean bags." He fell to the ground, and a third officer shot him with a Taser. *Caruthers, supra,* 339 Fed.Appx. at 989. Officer McCawley's version of the facts was that Caruthers was not holding his hands in a surrender position, and that he appeared instead to be holding a "dark object" when he exited from the room, looked both ways, and suddenly turned and spun his body toward McCawley. Four other officers stated in post-incident investigations that they saw Caruthers holding a towel, and did not see a weapon. The Eleventh Circuit, noting that Caruther's sworn complaint, and the post-incident interviews clearly established a genuine issue of material fact regarding whether a reasonable officer would have believed that Caruthers was armed and deadly force was justified. The Appellate Court therefore affirmed the district court's judgment, noting that the district court did not err in denying summary judgment based on qualified immunity grounds. *Caruthers, supra,* at 989.

off the floor. Forensic examination revealed that Mr. Lundgren was struck in the right temple by one bullet, that first passed through the desk. Investigators found no evidence suggesting that either Mr. or Mrs. Lundgren fired a shot. The pistol found at the store had lint inside the barrel, no ejected shell casings from that gun were found, and no gunshot residue was present on Mr. Lundgren's hands.

As noted by the Eleventh Circuit, in *Lundgren, supra,* 814 F.2d at 602–603, the Supreme Court in *Tennessee v. Garner,* "has indicated that 'if the suspect threatens the officer with a weapon … deadly force may be used,' " and therefore if the facts were as the appellants claim, then the deputies' conduct would violate no constitutional rights. *Lundgren, supra,* at 602. The Court, however, finding that the facts were in dispute, and were sharply contested by the parties, determined that a jury could reasonably have believed that the officers were neither threatened by a weapon, nor were fired upon, but rather that the officers without provocation had shot an undangerous suspect. *Id.,* at 602–03 The Court announced its conclusion, stating: "We hold that shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was—even in July, 1983—an unreasonable seizure and clearly violated fourth amendment law." *Lundgren,* 814 F.2d at 603.

In *Samples,* the officer [Oglesby] and suspect [Samples] were the only persons present at the shooting, and there were no other witnesses to the incident. Because Samples was deceased, the only available account came from Officer Oglesby himself. In *this* case, the officer [defendant Gutierrez] and the suspect who was shot [plaintiff Jean–Baptiste] also were the only persons present at the scene of the shooting; but there was another eye witness [the air conditioning technician Perez whose testimony is consistent with plaintiff Jean–Baptiste's version of the facts, that after the first shot or two he fell to the ground].

In *Samples,* the Eleventh Circuit found that summary judgment for defendant Officer Oglesby was inappropriate because the evidence was not uncontroverted, as the defendants alleged. Although there was evidence from which a fact finder could conclude that Oglesby's actions were reasonable, there also was evidence suggesting the contrary conclusion. Oglesby testified that he was driving in a high crime area, and saw Samples screaming like a demented person in a phone booth. He radioed his intent to investigate, and exited his police car to question Samples. Samples responded by throwing a Fanta grape soda bottle at Oglesby. Oglesby also said that Samples pulled a knife from his pocket and began opening it, and while doing so approached him in a threatening manner. Oglesby told Samples to stop opening the knife, but instead of listening he moved even closer. Oglesby then shot Samples. Oglesby explained that he did so because he feared for his life. The first shot did not stop Samples, and only seemed to increase his anger and efforts to approach and harm Oglesby. Oglesby stated that he then continued to shoot, until Samples turned around, took a few steps, and fell to the ground. Information that was available, which supported Oglesby's version of the facts, included that Samples was on the phone talking to his mother around the time of the shooting; that he was admittedly in a confused and emotional state; that he had almost gotten into a fight earlier in the evening; that there was a broken Fanta bottle at the scene, and that a knife lay on the ground not far from Samples' dead body. There also were facts which raised contrary inferences. The knife that lay near Samples was unopened, although it was of the type that automatically closes if the blade is not

opened beyond a 40 degree angle. The court noted that it was possible that Samples started to open the knife but was shot before he could do so, and the blade automatically closed. It was also possible, however, that Samples never attempted to open the knife, which the Court noted would "if true, ... raise a serious issue regarding the question of excessive force." The Court noted that there was additional physical evidence from which a fact finder could infer that—even based on Oglesby's version of the facts—Oglesby was excessively violent. The knife itself was one such piece of evidence, because it was a small one, with a three inch blade. The Court noted that a jury could conclude that Oglesby applied excessive force in reacting as he did to a small, at least partially-unopened pocket knife. The Court also noted that one of the bullets struck Samples in the back. This raised a serious issue of fact. While it was possible that the force of the first four bullets spun Samples around, so that the fifth struck him in the back, it is also possible that Samples turned to run away, and that Oglesby continued shooting. The Court noted, however, that another possibility was that the first shot hit Samples in the back, and that this so angered him that he turned and started running at Oglesby. The Court noted that in either scenario serious issues of fact existed regarding the question of excessive force, and therefore summary judgment was inappropriate.

In *Carr v. Tatangelo*, 338 F.3d 1259 (11 Cir.2003), decided the day before Jean–Baptiste's July 24, 2003 shooting in this case, the Eleventh Circuit held that Officer Fortson who shot appellant Carr with intent to kill him, was entitled to qualified immunity, where evidence established that Fortson who had drawn his weapon, did not fire his gun until he saw Carr point what he believed to be a gun at Officer Tatangelo who was hiding in some bushes, and Fortson heard a distinctive sound that he believed to be the chambering of a bullet. Tatangelo also heard the sound of a bullet being chambered. The Court, in *Carr*, noted that under the Supreme Court's opinion in *Garner* it was constitutionally permissible to use deadly force when the officer had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others, and determined that Fortson, as well as fellow officers, were entitled to qualified immunity.

It does not appear that *Carr* is dispositive of plaintiff Jean–Baptiste's claims, because in this case there is a serious dispute between defendant Gutierrez's and plaintiff Jean–Baptiste's evidence, regarding whether plaintiff pointed a gun at Gutierrez and thereby allegedly put him in fear for his life.

As discussed above in this Report, and in the earlier report in this case, two weapons possession charges brought against Jean–Baptiste were dismissed [Unlawful Possession of a Firearm by a Convicted Felon; and Unlawful Possession of a Firearm by a Violent Career Criminal]. In addition, when Jean–Baptiste was tried to a jury he was acquitted of all charges related to use of a firearm during his encounter with Officer Gutierrez [the charge of Aggravated Assault on a Law Enforcement Officer, was based on pointing a firearm at Gutierrez and thereby creating in him a well-founded fear that violence was imminent]. Jean–Baptiste was also acquitted of the lesser included offenses [aggravated assault, assault on a LEO, and simple assault].

Here, where the plaintiff's and defendant's sworn versions of the material facts are conflicting, it is apparent that summary judgment based on qualified immunity is not appropriate.

The fact that plaintiff Jean–Baptiste was acquitted of all assault charges against

Officer Gutierrez creates a serious question regarding Gutierrez's claim that when he encountered Jean–Baptiste by the shed in a back yard Jean–Baptiste was pointing a handgun directly at him, and that instead of giving a warning that he would use deadly force, he immediately commenced firing his police weapon, discharging it without stopping until all his bullets were expended, because he feared that Jean–Baptiste was at that moment about to shoot and kill him.

As discussed in the prior Report, and this one, there also is conflicting evidence regarding whether Gutierrez continuously shot his weapon, emptying the clip without stopping, finally bringing the plaintiff to the ground only after the 12th or 14th round had been discharged; or whether he shot the plaintiff, bringing him to the ground with a shot to the testicles after only one or two rounds, and then continued firing an additional 10 or 12 times, standing over the plaintiff from about 8–10 feet away, after he was already wounded and on the ground, and while doing so struck plaintiff with projectiles approximately 6 or 7 more times.

If it were the defendant's version of the facts that must be taken as true at summary judgment for purposes of determining qualified immunity, then under the applicable law, it is apparent that the Gutierrez would be entitled to qualified immunity. Under that scenario, an officer was faced with an immediately life threatening situation, and having no time to react because a suspect he had been pursuing on foot was pointing a gun at him and presumably was about to kill him, he discharged his weapon in a matter of seconds, expending all his bullets to save his own life. See *Tennessee v. Garner, supra,* at 11–12, 105 S.Ct. 1694; *Carr v. Tatangelo, supra.*

Here, however, for purposes of determining qualified immunity at summary judgment, the court must take the evidence of record and construe it in the light most favorable to the plaintiff.

Even accepting the evidence that Officer Gutierrez responded to a BOLO indicating that suspects fleeing from a burglary scene were believed to be armed, and encountered and pursued the suspects who were fleeing in a car of the description given in the BOLO, and then engaged in foot pursuit, it appears under existing precedent at the time of plaintiff's arrest, if the plaintiff's version of the facts is taken as true, that a jury could find that it was unreasonable for Gutierrez to engage in use of deadly force (i.e. shooting to kill) when he encountered Jean–Baptiste in the back yard of a house, near a shed. (According to Jean–Baptiste, he was simply standing there without a cocked weapon, and was not pointing a gun at Gutierrez or in any other way threatening Gutierrez so as to put him in fear for his life). Although evidence of record indicates that plaintiff had previously been fleeing by car and on foot from officers including Gutierrez, the evidence does not indicate that once Gutierrez found him in the yard by the shed, and had him covered with his police issued weapon, that Jean–Baptiste turned or made any further effort to flee. Under the facts, taken in the light most favorable to the plaintiff Jean–Baptiste, a jury could reasonably believe that he was at that point in time a suspect, who was not actively threatening or confronting the officer with weapon, and was no longer attempting to run from the officer who had drawn his service weapon and was pointing it at him.

Under *Garner,* and under Circuit precedent (*see Lundgren supra,* a case where officers entered a premises in which they believed a break-in was ongoing, but due to conflicting evidence it was not clear that a weapon found at the scene was wielded

against officers before a policeman shot and killed the shop owner who was mistaken for an intruder) it appears, where facts are in dispute about whether police were threatened with the display of a weapon, and that alleged display (or use) of the weapon is the basis for an officer's contention that his use of deadly force was justified, there is a genuine issue of material fact which should preclude a determination on summary judgment that the defendant is entitled to qualified immunity.

Insofar as there is evidence that a non-police handgun was found at the scene, near a pile of clothing stripped from the wounded plaintiff Jean–Baptiste by paramedics, which included plaintiff's pants with a holster inside the waistband, that evidence, taken in the light most favorable to the plaintiff [and considered in conjunction with plaintiff's sworn statements that he did not point a gun at Gutierrez, that he did not possess a cocked gun, and that if a cocked gun was found at the scene someone else cocked it], could be interpreted by a reasonable jury in more than one way. One interpretation could be that plaintiff in fact had no weapon [though he never comes out and directly denies possessing a firearm, but rather only denies possessing a cocked weapon, and denies pointing a weapon at officer Gutierrez]. The evidence could also be interpreted to indicate that plaintiff had a weapon on his person, but that it was not drawn, and instead was tucked in the holster inside his pants at the time Gutierrez encountered him, and was never displayed by plaintiff so as to put Officer Gutierrez in fear of harm as charged in the Information.

Under *Garner, Samples,* and *Skrtich,* it appears, where the evidence does not indicate that plaintiff Jean–Baptiste turned to run when confronted by officer Gutierrez who had his service pistol drawn and pointed him, and where there exist genuine issues of material fact regarding whether the plaintiff threatened Gutierrez with a gun as the officer alleges, a jury could conclude that the use of force was excessive; and therefore the defendant officer should not be entitled to summary judgment based on qualified immunity for opening fire on Jean–Baptiste without warning.

It would follow, under *Garner, Samples,* and *Skrtich,* [taking the evidence in the light most favorable to the plaintiff] that a jury could conclude that shooting at and wounding the plaintiff an additional 6 to 7 times after the first two shots had already taken him to the ground was an excessive use of force, where that evidence would suggest that the plaintiff [who presumably was not threatening officer Gutierrez with a weapon] was at that time on the ground, incapacitated and not attempting to or able to flee; and therefore the defendant officer should not be entitled to summary judgment based on qualified immunity for the alleged continued use of force after plaintiff was already shot, and lying injured on the ground. (It is noted that the defendant has argued that it is immaterial whether he shot the plaintiff twice, or 14 times, because once he was justified in shooting the plaintiff at all, he was justified to continue application of such force until the plaintiff was dead). It appears, under the facts of this case taken in the light most favorable to the plaintiff, that applying and accepting that argument here would ignore precedent (*Garner* and *Skrtich*) holding that when an individual is not posing a threat to an officer and trying to flee, deadly force is inappropriate, or that when an individual initially resisted but was longer posing a threat, the use of force should cease.

In sum, in this case the parties' versions of the facts are at odds, there are issues of material fact in dispute which impact on the questions of the nature of the threat

that plaintiff Jean–Baptiste posed to the defendant Officer Gutierrez, and regarding the nature and extent of force that was appropriate under the circumstances. The resolution of those questions should be left to a jury; and if the defendant Officer Gutierrez is entitled to qualified immunity, that determination should be made at trial. *Chandler v. Baird,* 926 F.2d 1057 (11 Cir. 1991); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

It is therefore recommended that: 1) the defendant Gutierrez's Motion for Summary Judgment (DE# 37) be denied; and 2) the case remain pending on the claim that Gutierrez used excessive force, when shooting the plaintiff Jean–Baptiste during the course of his arrest on July 24, 2003.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.